## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-3927

ATLANTIS ADAPT,
DAWN RUSSELL,
CLAUDIA FOLSKA,

      Plaintiffs,

v.

REGIONAL TRANSPORTATION DISTRICT,

      Defendant.

---

## COMPLAINT

---

Plaintiffs, by and through their counsel, Andy McNulty, Mari Newman, and Madeline Leibin of NEWMAN | MCNULTY, LLC, respectfully allege for their Complaint as follows:

### INTRODUCTION

1. Thousands of Coloradans with disabilities rely on a service called Access-on-Demand provided by the Regional Transportation District ("RTD"), the agency responsible for public transit across Colorado's front range. Since 2020, Access-on-Demand has provided on-demand transportation for RTD users with disabilities through rideshare companies, such as Uber. Through Access-on-Demand, RTD users with disabilities are eligible for up to sixty rides per month, and RTD provides a $25 voucher toward the cost of each ride.

2. Access-on-Demand is a lifeline for Coloradans with disabilities. It is one of the only RTD programs that is relied on solely by Coloradans with disabilities. It offers flexible, consistent access to workplaces, grocery stores, doctor's offices, restaurants, and more —

allowing Coloradans with disabilities to access and enjoy public space on the same terms as Coloradans without disabilities.

3.      Despite the critical role played by Access-on-Demand, RTD has voted to drastically cut access to Access-on-Demand by charging RTD users with disabilities for this program on January 1, 2026, increasing the cost to per ride by 450%, and reducing the voucher amount available for each ride by 20%.

4.      Because of these changes, many Coloradans with disabilities will be completely unable to access RTD's services. Access-on-Demand is the only way that many Coloradans with disabilities are able to utilize RTD's public transit system.

5.      RTD is singling out riders with disabilities by drastically increasing the costs and cutting the services of Access-on-Demand while at the same time enjoying revenue that is supposed to be used to maintain services for disabled riders and even *reducing* the cost of services for Coloradans *without* disabilities.

6.      Notably, RTD is drastically increasing the costs and cutting the services of Access-on-Demand shortly after reducing the cost of services for Coloradans without disabilities. Just last year, RTD lowered daily fares for its bus, commuter rail, and light rail services for Coloradans without disabilities by nearly 10% and its monthly fares by 33%.[1]

7.       Atlantis ADAPT – an organization which was founded to fight for access to public transit, and whose members' activism led to passage of the Americans with Disabilities Act ("ADA") – with advocates Ms. Dawn Russell and Dr. Claudia Folska, file this lawsuit in order to halt RTD's planned cost increases and service reductions to Access-on-Demand, which

---

[1] Nathaniel Minor, *RTD is cutting fares for the first time in decades*, COLORADO PUBLIC RADIO NEWS (July 20, 2023), available at: https://www.cpr.org/2023/07/20/after-decades-of-price-increases-rtd-denver-buses-trains-is-poised-to-cut-fares/.

violate their statutory rights. RTD's actions disparately impact Coloradans with disabilities in violation of the ADA and Colorado Anti-Discrimination Act ("CADA"). They also violate the plain language of Colorado Ballot Measure 7A, which required that money retained by RTD be utilized to maintain "the availability of services for people with disabilities."

## JURISDICTION AND VENUE

8.    This action arises under the laws of the United States and is brought pursuant to 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331 for Plaintiffs' claims arising under the ADA, 42 U.S.C. §§ 12181, *et seq.*

9.    Supplemental pendent jurisdiction is based on 28 U.S.C. § 1367, because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

10.    Jurisdiction supporting Plaintiffs' claims for attorney fees and costs is conferred by 42 U.S.C. § 12205, 29 U.S.C. § 794a, Colo. Rev. Stat. § 24-34-802(3), and Colo. Rev. Stat. § 24-34-505.6(6)(b).

11.    Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this Complaint.

## PARTIES

12.    At all times relevant to the subject matter of this litigation, Plaintiff Atlantis ADAPT, formerly known as American Disabled for Accessible Public Transit, is an organization based in the State of Colorado. Members of ADAPT are individuals with disabilities who access the services of RTD, including the Access-on-Demand program. Individuals that ADAPT serves access the services of RTD, including the Access-on-Demand program.

13.     At all times relevant to the subject matter of this litigation, Plaintiff Dawn Russell was a citizen of the United States and a resident of, and domiciled in, the State of Colorado. Ms. Russell is a qualified disabled individual eligible for the services provided by the RTD. *See* 42 U.S.C. § 12131(2); *see also* 42 U.S.C. § 12102(1).

14.     At all times relevant to the subject matter of this litigation, Plaintiff Claudia Folska was a citizen of the United States and a resident of, and domiciled in, the State of Colorado. Dr. Folska is a qualified disabled individual eligible for the services provided by the RTD. *See* 42 U.S.C. § 12131(2); *see also* 42 U.S.C. § 12102(1).

15.     At all times relevant to the subject matter of this litigation, RTD was a statutorily created entity, similar to a special district, and was the public entity responsible for providing accessible public transit. *See* 42 U.S.C. § 12131(1)(B). RTD provides a demand responsive system and designated public transportation to Coloradans. *See* 42 U.S.C. § 12141(1) and (2). RTD is a political subdivision of the state of Colorado and is a suable entity under Colorado law.[2]

## FACTUAL ALLEGATIONS

### ADAPT is a historic force for disability justice, both in Colorado and nationally.

16.     ADAPT was born from courageous advocacy for access to public transit for individuals with disabilities in Colorado.[3] Through public protests, marches, picketing, and other forms of civil disobedience, ADAPT's actions brought disability discrimination in public transit to light in various cities throughout the country. This resulted in many cities—Denver being the first—recreating their public transit system with full accessibility in mind. ADAPT's actions

---

[2] *See* Colo. Rev. Stat. § 32-9-119(1)(a) and (d).
[3] *See We Will Ride; The Gang of 19,* ADAPT, https://adapt.org/we-will-ride-the-gang-of-19/.

were also invaluable to the passing of the Americans with Disabilities Act in 1990.[4]

17.     ADAPT's members are individuals with disabilities and their allies. There is no membership fee. ADAPT focuses its resources on ensuring that individuals with disabilities can access public transit, as well as other public infrastructures and opportunities.

18.     One of ADAPT's most famous protests occurred on July 5th and 6th of 1978. At the intersection of Colfax and Broadway, ADAPT members later known as "The Gang of 19" threw themselves in front of RTD buses to protest RTD's lack of accessible public transit. Though General Assembly created RTD in 1969 to create, operate, and maintain a transit system for all Coloradans,[5] RTD had not yet provided transit for Coloradans with disabilities. "The Gang of 19" blocked the intersection of Colfax and Broadway all day and through the night, chanting "we will ride!" until representatives of the RTD agreed to meet with them and discuss its overdue provision of wheelchair-accessible buses in the Denver area.



*Accessible Caption: Black and white photo of three activists laying on the street in sleeping bags, in front of a bus with posters in the windshield, including one poster with the words "taxation without transportation" and an image of a wheelchair.*

---

[4] *See About Us,* ATLANTIS, https://atlantiscommunity.org/about-us/history-of-atlantis-adapt/.
[5] *See* Colo. Rev. Stat. § 32-9-101, *et seq.*,

19.     The "Gang of 19" were activists who grew up in nursing homes in Denver. They believed that individuals with disabilities should live independently in the community, as opposed to in isolation in institutions.

20.     The protest at Colfax and Broadway captured national attention and sparked similar activism across the nation about the injustices faced by individuals with disabilities in public space. The protest is credited with having ignited the mass movement that caused the ADA to be signed into law twelve years later, in 1990.

21.     The importance of accessible public transit, in particular, was underscored in the ADA. Congress explicitly recognized the isolation caused by lack of access to public transit.[6]

22.     Locally, before the ADA protections were enacted, activists affiliated with ADAPT filed a lawsuit against RTD in Colorado's federal district court, claiming that RTD was discriminating against individuals with disabilities by failing to provide them with accessible public transit.

23.     As a part of that lawsuit, plaintiffs testified about their ejection from public space before the Honorable Richard P. Matsch. One of the plaintiffs testified that lack of accessible public transit demoted him to "a second-class citizen." Another advocate testified about the economic burden forced on individuals with disabilities by the necessity of hiring private transit: she had personally spent about one-fifth of her income, monthly, on wheelchair-accessible taxis. She shared that the high cost of those taxis deterred all but essential use, shutting her out of public space.

24.     Of particular note, the witnesses testified that RTD's HandiRide service, which at

---

[6] *See* 42 U.S.C. § 12101 (a)(2) and (3); *see also* 42 U.S.C. §§ 12141 — 12165 (statutory sections specified for "actions applicable to public transportation provided by public entities considered discriminatory").

the time was the only service provided to Coloradans with disabilities, was no solution to the transit inequity because HandiRide only made scheduled stops at pre-set medical facilities, schools, and workplaces. One of the witnesses testified that while she could take HandiRide to work, she could not use it to get home because she had no set end time to her workday. HandiRide was the predecessor program to RTD's Access-a-Ride program. The case ultimately settled and paved the way for the access to public transit relied upon by Coloradans with disabilities today.

**Following ADAPT's advocacy, RTD began to provide accessible public transit.**

25.     Following such significant advocacy in the courts and community, RTD committed to making its fleet wheelchair accessible.

26.     In 1992, and following the 1990 passage of the ADA, RTD began providing paratransit services through a program known as Access-a-Ride. In 1997, recognizing the need for more flexible public transit options for RTD users with disabilities, RTD opened its Access-a-Cab service, an on-demand transportation service for individuals with disabilities that partnered with local taxi companies.

27.     Access-a-Cab became a mainstay for RTD users with disabilities. Across the next two decades, it evolved to meet new transportation modes. Accordingly, in October of 2020, the RTD Board of Directors considered expanding Access-a-Cab service to allow users to order transportation on-demand through rideshare companies, such as Uber.

28.     The next month, in November of 2020, the RTD General Manager and Chief Executive Officer, Debra A. Johnson, approved a request to include Uber as a part of the Access-

a-Cab service. The pilot began in four zip codes, with time restrictions.[7]

29.     In June of 2021, following the immense success of Uber's inclusion as an Access-a-Cab option, the pilot expanded to encompass three additional zip codes.

30.     In January of 2022, following the expanded pilot's immense success, Access-a-Cab came to officially include Uber as an on-demand option in addition to local taxi companies. The pilot and Access-a-Cab services were merged, and named Access-on-Demand. All zip codes within RTD's service areas were included, and all previous time of day restrictions were eliminated.

31.     In August of 2022, in recognition of the high cost of the service relative to other RTD services such as Access-a-Ride, RTD began to operate Access-on-Demand with a $0 fare.

32.     By January of 2023, three other rideshare companies were included in Access-on-Demand in addition to Uber: Lyft, zTrip, and MetroTaxi.

33.     Today, Access-on-Demand users may order rides from rideshare companies up to sixty times per month, and RTD provides $25 toward the cost of each ride.

34.     To qualify for Access-on-Demand, Coloradans with disabilities must show that they have a qualifying disability by providing RTD their Access-a-Ride identification number. An Access-a-Ride identification number is attained by submitting a medical verification form completed by a healthcare provider, completing a written application, and undergoing an in-person assessment. The healthcare provider must be treating the disability for which the applicant is seeking paratransit service. Given these requirements, every person who uses  the Access-on-Demand program is a qualified person with a disability under the ADA and CADA.

---

[7] *See Access on Demand Pilot with RTD's Access-a-Ride*, UBER (Nov. 2020), https://www.uber.com/blog/rtd-access/.

35.    Access-on-Demand is a lifeline for Coloradans with disabilities, enabling them to access workplaces, grocery stores, doctor's offices, restaurants, and other public space on the same terms as Coloradans without disabilities. It made an immediate impact on Coloradans with disabilities' abilities to live independently. As a reflection of the impact Access-on-Demand has on the lives of Coloradans with disabilities, the number of active Access-on-Demand users increased from 2,191 users in October 2023 to 3,398 users in August 2025.[8] This increase in users was due, in large part, to how Access-on-Demand met RTD users with disabilities' needs—for flexibility and consistency, for example—for the first time since 1992, when RTD began providing services to individuals with disabilities.

36.    Access-on-Demand allows for Coloradans with disabilities to access RTD's services equally with non-disabled users. Often, Coloradans with disabilities are unable to access fixed route public transit because they are unable to reach service stations or transit stops.

37.    Coloradans with disabilities are often unable to access the Access-a-Ride service because it requires users to order rides at least a full day in advance and for specific times. This does not take into consideration spontaneous transportation needs, such needs to travel to healthcare facilities for emergent medical care, or to travel home to manage medical conditions or symptoms with privacy and dignity.

---

[8] Tara Broghammer, *RTD's Board of Directors Approves Program Updates for Access-on-Demand Services,* RTD (Oct. 1, 2025 1:58), https://www.rtd-denver.com/community/news/rtd-s-board-of-directors-approves-program-updates-for-access-on-demand-services. For context, RTD serves 3.09 million Coloradans, in 2,342 square miles of service area, including all or part of eight counties: Adams, Arapahoe, Boulder, Broomfield, Denver, Douglas, Jefferson, and Weld. *See* RTD, *At A Glance,* https://www.rtd-denver.com/open-records/reports-and-policies/facts-figures; *see also Memorandum: Regional Transportation District Overview*, COLORADO LEGISLATIVE COUNCIL STAFF Feb. 17, 2020), https://content.leg.colorado.gov/sites/default/files/r191404_rtd_interested_persons_memorandum_0.pdf.

38.     Despite requiring Coloradans with disabilities to schedule rides for specific times, the Access-a-Ride program does not arrive at the specified time and only arrives in a window of time that encompasses the time requested. Access-a-Ride rides are often late. This unpredictable arrival time creates immense difficulty for RTD users with disabilities who aim to arrive to doctor's offices, workplaces, or other destinations in a timely manner.

39.     Further, Access-a-Ride is not governed by any requirements for drop-off time. Because of this, RTD users with disabilities are often unexpectedly subjected to extremely long ride durations, which also impacts their timeliness and can cause medical difficulties.

40.     In sum, the Access-a-Ride service excludes a number of Coloradans with disabilities from accessing RTD's services. Access-on-Demand is the only service that allows Coloradans with disabilities to access RTD's programs and services in the same way that Coloradans without disabilities are able to access RTD's programs and services.

41.     By October of 2024, 35% of RTD users with disabilities exclusively used Access-on-Demand, given its superior service.

**RTD denies Coloradans with disabilities the Access-on-Demand service, while providing greater access to its services to Coloradans without disabilities.**

42.     RTD began to cut Access-on-Demand services in January of 2024 by eliminating the multi-stop option on Uber for Access-on-Demand users.

43.     RTD, through its General Manager and Chief Executive Officer ("GM/CEO"), Debra A. Johnson, also began to lay the groundwork for further cuts to Access-on-Demand starting in February of 2024 by initiating a Peer Review of Access-on-Demand by the American Public Transportation Association ("APTA"). In August 2024, the APTA Paratransit Peer Review was completed.

44.     The APTA Paratransit Peer Review found that the sole issue with Access-on-

Demand was that it was *too* effective, and therefore popular. The APTA Paratransit Peer Review suggested changes to cut access to Access-on-Demand including: charging a base fare for trips, disallowing rides that cost over a certain threshold, capping monthly trips at thirty to forty, and/or decreasing the program's boundaries and hours to match those of Access-a-Ride.

45.     In September of 2024, RTD issued a survey that made it clear to ADAPT, the individuals with disabilities that it represents and serves, Ms. Russell, and Dr. Folska that it intended to significantly restrict the ability of individuals with disabilities to utilize the Access-on-Demand program.

46.     In its November 2024 meetings, RTD began mischaracterizing Access-on-Demand as a "premium, supplemental service" in a blatantly illegal attempt to begin disparately impacting individuals with disabilities by cutting services and increasing the costs of Access-on-Demand.

47.     In February of 2025, RTD, through GM/CEO Johnson, threatened that Access-on-Demand would come to a complete halt if more funding — in the arbitrary amount of $2 million — was not approved for it. Through spring and summer of 2025, RTD assembled and polled groups compromised almost exclusively of individuals without disabilities in order to explore how to dismantle Access-on-Demand.

48.     In July of 2025, the relevant RTD committees, including the Operations, Safety and Security ("OSS") Committee, proposed significant cuts to the Access-on-Demand service.

49.     During a July 29, 2025, Board Meeting, the RTD Board voted to honor Wade Blank, a founding ADAPT member, while exploring how to cut Access-on-Demand and deny RTD users access to its programs and services.

50.     On August 1, 2025, RTD celebrated the 35th anniversary of the ADA,

hypocritically honoring the efforts of the "Gang of 19" while actively seeking to discriminate against RTD users with disabilities by cutting services and imposing costs for use of Access-on-Demand.

51.    ADAPT, the individuals with disabilities that it represents and serves, Ms. Russell, and Dr. Folska were enraged that their history would be celebrated while RTD was actively seeking to discriminate against them by cutting Access-on-Demand services and imposing costs. In response, they organized a protest of dozens of disabled RTD users and their allies in front of the RTD headquarters.

52.    Moreover, ADAPT, the individuals with disabilities that it represents and serves, Ms. Russell, and Dr. Folska, and other organizations submitted over 500 unique comments from different individuals attesting to the value and urging RTD to continue provision of the Access-on-Demand service.

53.    On September 30, 2025, the RTD Board approved large changes to the Access-on-Demand service that will deny Coloradans with disabilities access to RTD's programs and services. The changes will go into effect on January 1, 2026. The changes include:

- A 450% increase in the fare per trip for Coloradans with disabilities who use Access-on-Demand: instead of being included as a service of RTD, only RTD users with disabilities will now pay a $4.50 fare per ride;

- A 20% decrease in the subsidy per ride for the people with disabilities who rely on Access-on-Demand: rather than the prior subsidy of $25 per ride, the subsidy will be only up to $20 per ride; and

- A significant decrease in service hours for the people with disabilities who rely on Access-on-Demand: Access-on-Demand will no longer offer service between 1:30

a.m. and 3:30 a.m.

54.    RTD is also forcing all users with disabilities to re-enroll in order to use Access-on-Demand moving forward, including those individuals with disabilities who have already jumped through the significant hoops to prove their disabled status with the verification of their medical provider. RTD has warned users with disabilities that they should re-enroll during November or early December 2025 or they could face service interruption.

55.    RTD is not imposing similar cuts to services or increased costs for RTD services to users without disabilities, nor is RTD requiring non-disabled users to re-enroll in the various services that RTD they rely upon. RTD is only subjecting users with disabilities to these negative impacts.

56.    RTD, through its cuts to Access-on-Demand and imposition of Access-on-Demand costs onto RTD users with disabilities, discriminates against RTD users with disabilities.

57.    RTD has not implemented similar cuts to services or similarly increased costs for RTD users without disabilities; in fact, within a year of increasing costs for RTD users with disabilities by 450%, RTD cut the cost of services for RTD users without disabilities by between 10% and 33%.

58.    Because of the changes implemented by RTD, there are a significant number of Coloradans with disabilities, including members of ADAPT, the individuals with disabilities that they represent and serve, Ms. Russell, and Dr. Folska, who will be completely unable to access RTD's programs and services.

59.    Because of the changes implemented by RTD, members of ADAPT, the individuals with disabilities that they represent and serve, Ms. Russell, and Dr. Folska will have

significantly reduced access to RTD's programs and services.

60.    RTD's imposition of costs for Access-on-Demand and cuts to services will disparately exclude RTD users with disabilities from the benefits of RTD's services because of their disabilities.

61.    Because of RTD's imposition of the changes to the Access-on-Demand program, RTD users with disabilities receive less benefits and services from RTD because of their disabilities.

62.    ADAPT's members and the individuals with disabilities that they represent and serve, Ms. Russell, and Dr. Folska will not be able to afford Access-on-Demand given the imposition of a $4.50 cost per ride, and a $5 less subsidy than was previously offered. ADAPT's members and the individuals with disabilities that they represent and serve will be impacted by the lack of service between 1:30 a.m. and 3:30 a.m.

63.    ADAPT's members, the individuals with disabilities that they represent and serve, Ms. Russell, and Dr. Folska will be disproportionately excluded from the benefits of RTD's services because of their disabilities because of RTD's changes to the Access-on-Demand program.

64.    ADAPT's members, the individuals with disabilities that they represent and serve, Ms. Russell, and Dr. Folska have suffered and will continue to suffer damages due to RTD's disproportionate exclusion of them and others with disabilities from RTD's services.

**RTD continues to expand access to its services for individuals without disabilities.**

65.    While RTD restricted access to its programs and services for RTD users with disabilities, it expanded access to services for RTD users without disabilities.

66.    In January of 2024, the same month RTD eliminated the multi-stop option on

Uber for Access-on-Demand users, RTD simultaneously lowered the fares for all single-use passes by approximately 10% and monthly passes by 33%. RTD also reduced the number of fare zones, expanding access for RTD users without disabilities. RTD further reduced the cost for travel to and from the airport for monthly RTD users.

67.     In late 2024, RTD and the Colorado County Clerks Association announced that RTD services would be made available to all riders for free on Tuesday, October 29, 2025 (National Vote Early Day), and November 5, 2025, (Election Day).

**Contrary to its public claims, RTD has sufficient funding for Access-on-Demand.**

68.     Beginning as early as September 2023, RTD officials began to circulate a false narrative that Access-on-Demand was "growing out of control," "ballooning," and "unsustainable." The data flatly contradicts those claims.

69.     RTD was given permission by Colorado voters to keep its projected revenue of about $50 million to $60 million a year by Ballot Measure 7A in 2024 (which passed with 79% of the vote). The language of Ballot Measure 7A expressly required that if the RTD was to keep projected revenue, the retained revenue would be used to maintain "the availability of services for people with disabilities." The funding from Ballot Measure 7A demonstrates the financial wellbeing of RTD, especially for provision of services for RTD users with disabilities.

70.     The projected spending on Access-on-Demand for 2025 was $15.3 million — virtually identical to the spending on Access-on-Demand for 2024. In fact, the projected spending is half a million dollars less than the 2025 approved Access-on-Demand budget of $15.8 million.

71.     Acting Assistant Manager of Bus Operations Erin Vallejos has stated publicly that Access-On-Demand costs RTD 80% less per trip than Access-a-Ride. While Access-on-Demand

only costs RTD about $22 a ride, Access-a-Ride costs approximately $106 a ride. In effect, utilization of Access-on-Demand rather than Access-a-Ride reduces total paratransit costs for RTD, while also providing users with disabilities the same flexibility as non-disabled riders.

72.     RTD's voluntary decisions to cut funding sources borne by people without disabilities also demonstrate the falsity of its assertion it lacks sufficient funding to continue to provide Access-On-Demand services without the planned fee increases and service cuts to be shouldered by people with disabilities.

73.     RTD's above-described decreases in fares for non-disabled riders that occurred in January of 2024 also had the effect of decreasing funding for RTD as it collected less money from RTD users without disabilities per trip. While RTD was increasing the cost of trips for RTD users with disabilities, and claiming that it was facing budgetary issues, it was significantly decreasing costs for RTD users without disabilities and, consequently, a revenue source.

74.     RTD has taken other steps to decrease its revenue.[9] RTD's decision to cut revenue at the same time it was falsely claiming a budgetary crisis which required it to raise costs and cut services for people with disabilities demonstrates that any claims of insufficient funding for the Access-on-Demand service are categorically false.

75.     Even several RTD Directors recognized the false narratives that were supposedly motivating the decision to drastically cut access to services for RTD users with disabilities. In the November 2024 OSS Committee meeting, Director JoyAnn Ruscha noted that the RTD Board did not have enough data to make an informed decision about changes to the Access-on-Demand

---

[9] For example, RTD has decided to forego approximately $786,000 in advertising revenue. *See* Stuart G. Summers, *RTD to restrict advertisements on bus and train windows*, RTD (Oct. 29, 2025), https://www.rtd-denver.com/community/news/rtd-to-restrict-advertisements-on-bus-and-train-windows.

program and requested year over year cost data (including the costs of Access-a-Ride customer service; Access-on-Demand has no such costs) and any other evidence that cuts solely to Access-on-Demand were necessary. Ms. Ruscha followed up on her requests via a letter to RTD GM/CEO Johnson on February 11, 2025. On information and belief, none of Ms. Ruscha's requests were met.

76.     Several sources have noted that the budgetary data relied upon and cited by RTD in its decision to cut services and impose costs for Access-on-Demand to RTD users with disabilities is deceptive. For example, it erroneously included the costs of Wheelchair Accessible Vehicles ("WAVs") — which are utilized for both Access-a-Ride and Access-on-Demand — in the cost of Access-on-Demand's services to misleadingly generate a higher Access-on-Demand cost relative to Access-a-Ride.

**CLAIMS FOR RELIEF**
**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 12132, *et seq.* — Title II of the ADA**

77.     Plaintiffs incorporate all other paragraphs of this Complaint as if set forth herein.

78.     Title II of the ADA prohibits a public entity from excluding a person with a disability from participating in or otherwise benefiting from its programs, or otherwise discriminating against a person on the basis of disability: "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

79.     The ADA's protections extend to all aspects of a public entity's programs.

80.     Title II of the ADA also requires public entities to operate each of their programs, services, or activities so that when viewed in its entirety it is readily accessible to and usable by

17

individuals with disabilities.

81.    RTD is a public entity.

82.    RTD's provision of Access-a-Ride and Access-on-Demand is a service, program or activity within the meaning of Title II.

83.    Plaintiffs Russell and Folska are qualified individuals with disabilities and Plaintiff ADAPT's members, the individuals that they represent and serve, are qualified individuals with disabilities.

84.    RTD's herein described actions and inactions, including through its cuts to service and imposition of increased costs for Access-on-Demand, disparately discriminates against Plaintiffs and excludes them from participation in or denies them the benefits of RTD's services, programs, or activities.

85.    Further, RTD's herein described actions and inactions, including through its cuts of services and imposition of costs for Access-on-Demand, constitute a failure to provide access to public transit for individuals that is "comparable" to the services provided to individuals without disabilities. RTD does not provide a level of service that meets the needs of persons with and without disabilities to a comparable extent.

86.    RTD's herein described actions and inactions were and are intentional or deliberately indifferent to the rights of Plaintiffs' right to equally access public transit.

87.    RTD's herein described actions and inactions were and are the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries, damages, and losses.

**SECOND CLAIM FOR RELIEF**
**Colo. Rev. Stat. § 24-34-802, *et seq.* — CADA**

88.    Plaintiffs incorporate all other paragraphs of this Complaint as if set forth herein.

89.    The CADA provides that "[a]n individual with a disability . . . must not, by reason

18

of the individual's disability, be excluded from participation in or be denied the benefits of services, programs, or activities provided by a place of public accommodation, as defined in section 24-34-601(1), a public entity, as defined in section 24-34-301, or a state agency, as defined in section 24-37.5-102, or be subjected to discrimination by any such place of public accommodation, public entity, or state agency." Colo. Rev. Stat. § 24-34-802(1)(b).

90.    Plaintiffs Russell and Folska are qualified individuals with disabilities and Plaintiff ADAPT's members, the individuals that they represent and serve, are qualified individuals with disabilities under CADA.

91.    RTD is a public entity and provides a public transport service as defined in Colo. Rev. Stat. § 24-34-301.

92.    RTD discriminated against Plaintiffs on the basis of their disabilities in its disparate provision of public transit.

93.    RTD's herein described actions and inactions cause Plaintiffs to be excluded from participation in and deny the benefits of services, programs, or activities provided by RTD.

94.    RTD's herein described actions and inactions were and are intentional or deliberately indifferent to the rights of Plaintiffs to equally access public transit

95.    RTD's herein described actions and inactions were and are the moving force and the legal, direct, and proximate cause of Plaintiffs' injuries, damages, and losses.

### THIRD CLAIM FOR RELIEF
**Colo. Rev. Stat. § 13-51-101, *et seq.* — Colorado Uniform Declaratory Judgments Law**

96.    Plaintiffs incorporate all other paragraphs of this Complaint as if set forth herein.

97.    RTD, by refusing to fully fund the Access-on-Demand program is violating the plain language of Ballot Measure 7A, which explicitly states that RTD is to use retained revenues to "provide vital RTD services" including "maintain the availability of services for

people with disabilities."

98. By making the above-described changes to the Access-on-Demand program, RTD has failed to "maintain the availability of services for people with disabilities."

99. Pursuant to the Colorado Uniform Declaratory Judgments Law, Colo. Rev. Stat. § 13-51-101 *et seq.*, and C.R.C.P. 57, Plaintiffs are entitled to a declaration that RTD is violating the plain language of Ballot Measure 7A and, pursuant to C.R.C.P. 65, this Court should issue an injunction prohibiting RTD from violating the plain language of Ballot Measure 7A.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and award all relief as allowed by law, including, but not limited to the following:

a. Declaratory and injunctive relief, as appropriate;

b. Actual economic damages as established at trial;

c. Compensatory damages;

d. Non-economic damages;

e. Imposition of a statutory fine of $3,500 to each Plaintiff for each violation of the CADA;

f. Issuance of an Order mandating appropriate equitable relief;

g. Pre-judgment and post-judgment interest at the highest lawful rate;

h. Attorney's fees and costs; and

i. Such further relief as justice requires.

Dated: December 7, 2025.

NEWMAN | MCNULTY

*s/ Andy McNulty*

Mari Newman
Andy McNulty
Madeline Leibin
1490 N. Lafayette Street Suite 304
Denver, CO 80218
(720) 850 - 5770
mari@newman-mcnulty.com
andy@newman-mcnulty.com
madeline@newman-mcnulty.com

ATTORNEYS FOR PLAINTIFFS