IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

ATLANTIS ADAPT, *et al.*

    Plaintiffs,

v.

REGIONAL TRANSPORTATION DISTRICT,

    Defendant.

**MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs, by and through their counsel, move to enjoin Defendant Regional Transportation District ("RTD") from implementing changes that would disparately cut access to transit for Coloradans with disabilities starting on January 1, 2026, and state in support as follows:

1. **INTRODUCTION**

Thousands of Coloradans with disabilities rely on a service called Access-on-Demand provided by RTD, the agency responsible for public transit across Colorado's front range. Since 2020, Access-on-Demand has provided on-demand transportation for RTD users with disabilities through rideshare companies, such as Uber. Through the Access-on-Demand service, RTD users with disabilities are currently eligible for up to sixty rides per month, and RTD provides a $25 voucher toward the cost of each ride.

Access-on-Demand is a lifeline for Coloradans with disabilities. It is one of the only RTD programs that is relied on solely by Coloradans with disabilities. It offers flexible, consistent access to workplaces, grocery stores, doctor's offices, restaurants, and more — allowing Coloradans with disabilities to access and enjoy public spaces on the same terms as Coloradans without disabilities.

1

Despite the critical role played by Access-on-Demand, RTD has voted to drastically cut access to it beginning on January 1, 2026, by increasing the cost per ride by 450%, and reducing the voucher amount available per ride by 20%. Because of these changes, many Coloradans with disabilities will be completely unable to access RTD's services. The Access-on-Demand program is the only way that many Coloradans with disabilities are able to utilize RTD's public transit system.

RTD is singling out riders with disabilities by drastically increasing the costs and cutting the services of Access-on-Demand while at the same time enjoying revenue that is supposed to be used to maintain services for disabled riders and even *reducing* the cost of services for Coloradans *without* disabilities. Just last year, the RTD lowered daily fares for its bus, commuter rail, and light rail services for Coloradans without disabilities by nearly 10% and its monthly fares by 33%.[1] Further, RTD was given permission by Colorado voters to keep its projected revenue of about $50-60 million per year by Ballot Measure 7A in 2024 (which passed with 79% of the vote). The language of Ballot Measure 7A expressly required that if the RTD was to keep projected revenue, that revenue would be used to maintain "the availability of services for people with disabilities."

Disparate cuts to services that affect only Coloradans with disabilities while cutting costs for Coloradans without disabilities violates the Americans with Disabilities Act ("ADA") and Colorado Anti-Discrimination Act ("CADA"), along with violating the plain language of Ballot Measure 7A. As outlined below, this Court should enjoin RTD from disparately cutting Coloradans with disabilities' access to its services.

2. **FACTUAL BACKGROUND**

---

[1] Nathaniel Minor, *RTD is cutting fares for the first time in decades*, COLORADO PUBLIC RADIO NEWS (July 20, 2023), available at: https://www.cpr.org/2023/07/20/after-decades-of-price-increases-rtd-denver-buses-trains-is-poised-to-cut-fares/.

2.1 **RTD provides services to individuals with disabilities through Access-on-Demand.**

In 1992, RTD began providing paratransit services through a program known as Access-a-Ride. In 1997, recognizing the need for more flexible public transit options for RTD users with disabilities, RTD opened its Access-a-Cab service, an on-demand transportation service which partnered with local taxi companies. Across the next two decades, Access-a-Cab evolved to meet new transportation modes. In November of 2020, RTD began including Uber within the Access-a-Cab service in four zip codes. In June of 2021, the pilot expanded to encompass three additional zip codes. In January of 2022, following the immense success of Uber's inclusion as an Access-a-Cab option. Access-a-Cab was renamed Access-on-Demand with 24 hour a day service in all of RTD's service areas. In August of 2022, RTD began to operate Access-on-Demand with a $0 fare.

Today, RTD users with disabilities may use Access-on-Demand to order rides from rideshare companies up to sixty times per month, and RTD provides $25 toward the cost of each ride. To qualify for Access-on-Demand, an individual must show that they have a qualifying disability by submitting a medical verification form completed by a healthcare provider, completing a written application, and undergoing an in-person assessment. The healthcare provider must be treating the disability for which the applicant is seeking paratransit service. Given these requirements, every person who accesses the Access-on-Demand program is a verified qualified person with a disability under the ADA and CADA.

Access-on-Demand is a lifeline for Coloradans with disabilities, enabling them to access workplaces, grocery stores, doctor's offices, restaurants, and other public spaces on the same terms as Coloradans without disabilities. It has made an immediate and substantial impact on their abilities to live independently. As a reflection of the impact Access-on-Demand has on the lives of Coloradans with disabilities, the number of active Access-on-Demand users increased from

2,191 users in October 2023 to 3,398 users in August 2025.[2] This increase was due, in large part, to how Access-on-Demand meets RTD users with disabilities' needs — for flexibility and consistency, for example — for the first time since 1992.

### 2.2 RTD denies Coloradans with disabilities the Access-on-Demand service, while providing greater access to its services to Coloradans without disabilities.

RTD began to cut Access-on-Demand services in January of 2024 by eliminating the multi-stop option on Uber for Access-on-Demand users. RTD, through its General Manager and Chief Executive Officer ("GM/CEO"), Debra A. Johnson, also began to lay the groundwork for further cuts. In September of 2024, the RTD issued a survey that made it clear to Atlantis ADAPT ("ADAPT")[3], the individuals with disabilities that it represents and serves, Ms. Russell, and Dr. Folska that it intended to restrict access to the Access-on-Demand program for people with disabilities. In its November 2024 meetings, the RTD began mischaracterizing Access-on-Demand as a "premium, supplemental service" in a blatantly illegal attempt to begin disparately impacting individuals with disabilities by cutting services and increasing the costs of Access-on-Demand.

In February of 2025, RTD, through GM/CEO Johnson, threatened that Access-on-Demand would come to a complete halt if more funding — in the arbitrary amount of $2 million — was

---

[2] Tara Broghammer, *RTD's Board of Directors Approves Program Updates for Access-on-Demand Services,* RTD (Oct. 1, 2025 1:58), https://www.rtd-denver.com/community/news/rtd-s-board-of-directors-approves-program-updates-for-access-on-demand-services. For context, RTD serves 3.09 million Coloradans, in 2,342 square miles of service area, including all or part of eight counties: Adams, Arapahoe, Boulder, Broomfield, Denver, Douglas, Jefferson, and Weld. *See* RTD, *At A Glance,* https://www.rtd-denver.com/open-records/reports-and-policies/facts-figures; *see also Memorandum: Regional Transportation District Overview*, COLORADO LEGISLATIVE COUNCIL STAFF Feb. 17, 2020), https://content.leg.colorado.gov/sites/default/files/r191404_rtd_interested_persons_memorandum_0.pdf.
[3] Atlantis ADAPT is an organization which was founded to fight for access to public transit, and whose members' activism led to passage of the ADA. *See Compl.* ¶ 6.

4

not approved. Through spring and summer of 2025, RTD assembled and polled groups compromised almost exclusively of individuals without disabilities to explore how to dismantle Access-on-Demand. In July of 2025, the relevant RTD committees, including the Operations, Safety and Security ("OSS") Committee, proposed significant cuts to Access-on-Demand.

ADAPT, the individuals with disabilities that it represents and serves, Ms. Russell, and Dr. Folska, and other organizations submitted over 500 comments attesting to the value and urging RTD to continue provision of Access-on-Demand. Despite this overwhelming support for Access-on-Demand, on September 30, 2025, the RTD Board approved changes to Access-on-Demand that will deny Coloradans with disabilities — and only Coloradoans with disabilities — access to RTD's programs and services. These changes will go into effect on January 1, 2026:

- A 450% increase in the fare per trip for Coloradans with disabilities who use Access-on-Demand: instead of being included as a service of RTD, Access-on-Demand users will now pay a $4.50 fare per ride;
- A 20% decrease in the subsidy per ride for the people with disabilities who rely on Access-on-Demand: rather than the prior subsidy of $25 per ride, the subsidy will be only up to $20 per ride; and
- A significant decrease in service hours for the people with disabilities who rely on Access-on-Demand: Access-on-Demand will no longer run from 1:30 to 3:30 a.m.

RTD is also forcing all users with disabilities to re-enroll in order to use Access-on-Demand moving forward, including those individuals with disabilities who have already jumped through the significant hoops to prove their disabilities though verification by their medical provider. RTD is not imposing similar cuts to services or increased costs for RTD services to users without disabilities, nor is RTD requiring users without disabilities to re-enroll in the various services that

5

RTD they rely upon. RTD is only subjecting users with disabilities to these negative impacts.

2.3 **RTD's cuts to Access-on-Demand will deny individuals with disabilities, including Plaintiffs, access to RTD's programs and services.**

Because of the changes implemented by RTD, there are a significant number of Coloradans with disabilities, including members of ADAPT, the individuals with disabilities that they represent and serve, Ms. Russell, and Dr. Folska, who will be completely unable to access or who will have significantly reduced access to RTD's programs and services. In particular, these people with disabilities will not be able to afford Access-on-Demand given the imposition of a $4.50 cost per ride, and a $5 less subsidy than was previously offered. And, they will be impacted by the lack of service between 1:30 and 3:30 a.m. In sum, because of their disabilities, they will be disproportionately excluded from the benefits of RTD's services because of the changes to Access-on-Demand, and they have suffered and will continue to suffer damages due to RTD's disproportionate exclusion of them from its services.

2.4 **RTD continues to expand access to its services for individuals without disabilities.**

RTD, through its cuts to and imposition of costs for Access-on-Demand onto RTD users with disabilities, discriminates against RTD users with disabilities. RTD has not implemented similar cuts to services or similarly increased costs for RTD users without disabilities.

While RTD restricted access to its programs and services for RTD users with disabilities, it expanded access to services for RTD users without disabilities. In January of 2024, the same month RTD eliminated the multi-stop option on Uber for Access-on-Demand users, RTD simultaneously lowered the fares for all single-use passes by approximately 10% and monthly passes by 33%. RTD also reduced the number of fare zones, expanding access for RTD users without disabilities. RTD further reduced the cost for travel to and from the airport for monthly RTD users. In late 2024, RTD and the Colorado County Clerks Association announced that RTD

6

services would be made available to all riders for free on Tuesday, October 29, 2025 (National Vote Early Day), and November 5, 2025, (Election Day).

2.5 **RTD has sufficient funding for Access-on-Demand.**

Beginning as early as September 2023, RTD officials began to circulate a false narrative that Access-on-Demand was "growing out of control," "ballooning," and "unsustainable." The data flatly contradicts those claims. The projected spending on Access-on-Demand for 2025 was $15.3 million — virtually identical to the spending on Access-on-Demand for 2024. In fact, the projected spending is half a million dollars less than approved Access-on-Demand 2025 budget.

Acting Assistant Manager of Bus Operations Erin Vallejos has stated publicly that Access-On-Demand costs RTD 80% less per trip than Access-a-Ride. While Access-on-Demand only costs RTD about $22 a ride, Access-a-Ride costs approximately $106 a ride. In effect, utilization of Access-on-Demand rather than Access-a-Ride reduces total paratransit costs for RTD, while also providing RTD users with disabilities the same flexibility as non-disabled users. The above-described decreases in fares that occurred in January of 2024 also had the effect of decreasing funding for RTD as it collected less money from RTD users without disabilities per trip. And, RTD has taken other steps to decrease its revenue.[4] RTD's decision to cut revenue at the same time it was falsely claiming a budgetary crisis required it to raise costs and cut services for people with disabilities demonstrates that any claims of insufficient funding for Access-on-Demand are false.

Even several RTD Directors recognized the false narratives that were supposedly motivating the decision to drastically cut access to services for RTD users with disabilities. In the

---

[4] For example, it has decided to forego approximately $786,000 in revenue. *See* Stuart G. Summers, *RTD to restrict advertisements on bus and train windows*, RTD (Oct. 29, 2025), https://www.rtd-denver.com/community/news/rtd-to-restrict-advertisements-on-bus-and-train-windows.

7

November 2024 OSS Committee meeting, Director JoyAnn Ruscha noted that the RTD Board did not have enough data to make an informed decision about changes to Access-on-Demand and requested year over year cost data (including the costs of Access-a-Ride customer service; Access-on-Demand has no such costs) and any other evidence that cuts solely to Access-on-Demand were necessary. Ms. Ruscha followed up on her requests via a letter to RTD GM/CEO Johnson on February 11, 2025. On information and belief, none of Ms. Ruscha's requests were met.

Several sources have noted that the budgetary data relied upon and cited by RTD in its decision to cut services and impose costs for Access-on-Demand. For example, the data erroneously included the costs of Wheelchair Accessible Vehicles ("WAVs") — which are utilized for both Access-a-Ride and Access-on-Demand — in the cost of Access-on-Demand's services to misleadingly generate a higher Access-on-Demand cost relative to Access-a-Ride.

Importantly, Coloradans voted to allow RTD to keep its projected revenue of about $50-$60 million a year by Ballot Measure 7A in 2024 (which passed with 79% of the vote) with the express condition that it maintain "the availability of services for people with disabilities." The funding from Ballot Measure 7A demonstrates the financial wellbeing of RTD, especially for provision of services for RTD users with disabilities.

3. **STANDARD OF REVIEW**

To succeed on a preliminary injunction motion, a movant must show: (1) that the party is substantially likely to succeed on the merits; (2) that the party will suffer irreparable injury if the court denies the injunction; (3) that the party's threatened injury (without the injunction) outweighs

the opposing party's under the injunction; and (4) that the injunction is not adverse to the public interest. *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019).[5]

4. **LEGAL ARGUMENT**

    4.1 **Plaintiffs are likely to succeed on the merits of their ADA and CADA claims.**

Title II of the ADA and the CADA[6] seek "to remedy a broad, comprehensive concept of discrimination against individuals with disabilities, including disparate impact discrimination." *Chaffin v. Kan. State Fair Bd.*, 348 F.3d 850, 859-60 (10th Cir. 2003). "Disparate impact occurs when a facially neutral practice adversely affects members of a protected group more than others regardless of whether such adverse impact was actually intended." *Tyler v. City of Manhattan*, 118 F.3d 1400, 1405 (10th Cir. 1997). To establish a disparate impact claim, a plaintiff must demonstrate that "a specific policy caused a significant disparate effect on a protected group." *Cinnamon Hills Youth Crisis Ctr., Inc. v. Saint George City*, 685 F.3d 917, 922 (10th Cir. 2012). "The basis for a successful disparate impact claim involves a comparison between two groups — those affected and those unaffected by the facially neutral policy [that] reveal[s] that although neutral, the policy in question imposes a significantly adverse or disproportionate impact on a protected group of individuals." *Wilson v. New York*, No. 15-CV-23, 2017 U.S. Dist. LEXIS 10492, 2017 WL 9674497, at *15 (E.D.N.Y. Jan. 24, 2017) (citation modified), *report and recommendation adopted*, 2018 U.S. Dist. LEXIS 49609, 2018 WL 1466770 (E.D.N.Y. Mar. 26,

---

[5] The injunction sought by Plaintiffs is not a "disfavored" injunction because it merely prohibits actions, preserves the status quo, and does not grant all of the relief Plaintiffs could expect to achieve at a trial. *Free the Nipple-Fort Collins*, 916 F.3d at 797.

[6] The Colorado Anti-Discrimination Act is "interpreted consistently with the Americans with Disabilities Act." *Tesmer v. Colo. High Sch. Activities Ass'n*, 140 P.3d 249, 253 (Colo. Ct. App. 2006); *Gamble v. Levitz Furniture Co.*, 759 P.2d 761, 763-66 (Colo. App. 1988) ("The ADA and CADA are parallel statutes and the Colorado courts rely upon ADA cases in the interpretation of the CADA."); *Colo. Cross Disability Coal. v. Hermanson Family Ltd. P'ship*, Civil Action No. 96-WY-2490-AJ, 1997 U.S. Dist. LEXIS 24812, at *16 (D. Colo. Mar. 3, 1997).

2018). This is generally shown by "statistical evidence involving the appropriate comparables necessary to create a reasonable inference that any disparate effect was caused by the challenged policy and not other causal factors." *Cinnamon Hills*, 685 F.3d at 922 (internal quotation marks omitted). Notably, "a claim for disparate impact doesn't require proof of intentional discrimination." *J. V. ex rel. C. V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1298 (10th Cir. 2016) (internal quotation marks and citations omitted).

Here, there is strong evidence that RTD's cuts to Access-on-Demand will disparately impact individuals with disabilities. Access-on-Demand, which exclusively serves individuals with disabilities, is the only service for which RTD is imposing fare increases and service decreases, while RTD has cut fares and increased services for its other programs and services that serve primarily individuals without disabilities. RTD's disparate application of cuts only to a service that exclusively serves individuals with disabilities imposes a disparate impact on individuals with disabilities in violation of the ADA and CADA.

RTD has publicly contended that cuts to Access-on-Demand are necessary because of budgetary concerns, however, RTD is "unable to account for the extreme disparity between the extent of the budget cuts for the disabled population" and the lack of budget cuts for services provided to individuals without disabilities. *Concerned Parents to Save Dreher Park Ctr. v. City of W. Palm Beach*, 846 F. Supp. 986, 992 (S.D. Fla. 1994). RTD's proposed cuts to Access-on-Demand have "a vastly disproportionate impact on the disabled — one that effectively excludes them from the participation in and denies them benefits of the services and programs of [RTD] in a manner that violates the ADA." *Rodde v. Bonta*, No. CV 03-1580 FMC (PJWx), 2003 U.S. Dist. LEXIS 28808, at *22-23 (C.D. Cal. May 6, 2003).

Finally, even if this Court determines that RTD is not required to provide Access-on-Demand, when a public entity makes "a decision to serve qualified individuals with disabilities," having made that decision it may not "eliminate services" for people with disabilities when that "reduction in services" would deny individuals with disabilities access to the public entity's services. *Rodde*, 2003 U.S. Dist. LEXIS 28808, at *16-19. That is because the ADA's prohibition on discrimination in public programs "bring[s] within its scope anything a public entity does." *Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) (quotation marks omitted) (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001)). In other words, any argument by RTD that it "is not required" to provide Access-on-Demand "misses the point": "Title II of the ADA does not require that any particular benefits or services be provided by a public entity; rather[,] Title II requires that benefits or services that are provided must be distributed in a manner that does not discriminate against the disabled." *Rodde*, 2003 U.S. Dist. LEXIS 28808, at *22; *Concerned Parents to Save Dreher Park Ctr.*, 846 F. Supp. at 991 (holding that "although the City is not required to offer to the public (disabled or non-disabled) any type of recreational or leisure programs in the first place, when it does provide and administer such programs, it must use methods or criteria that do not have the purpose or effect of impairing its objectives with respect to individuals with disabilities").

    4.2 **Plaintiffs are likely to succeed on the merits of their Colorado Uniform Declaratory Judgment Law claim.**

"The Uniform Declaratory Judgments Law is a remedial statute that must be liberally construed and administered." *Aurora Urban Renewal Auth. v. Kaiser*, 2022 COA 5, ¶ 18 (citing C.R.S. § 13-51-102). Plaintiffs bring their claim under the Uniform Declaratory Judgments Law to enforce the language of Ballot Measure 7A, as widely approved by Coloradan voters in 2024. Courts "apply general principles of statutory interpretation to ballot initiatives." *Plains Metro.*

11

*Dist. v. Ken-Caryl Metro. Dist.*, No. 12CA1250, 2013 Colo. App. LEXIS 3039, at *13 (Ct. App. May 9, 2013) (citing *Mesa County Bd. of County Comm'rs v. State*, 203 P.3d 519, 533 (Colo. 2009)). "If the language of the ballot initiative is unambiguous" then the court is to "give effect to its plain meaning[.]" *Id.* at *13-14.

The plain language of Ballot Measure 7A states that the RTD must use the funds it was allowed by voters to retain to maintain "the availability of services for people with disabilities." At the time of the passage of Ballot Measure 7A, Access-on-Demand was operating in the same capacity as it currently operates. By cutting services and imposing increased costs for Access-on-Demand onto RTD users with disabilities, RTD is directly violating the plain language of Ballot Measure 7A and this Court should enjoin RTD from doing so.

### 4.3 **Absent an injunction, Plaintiffs would suffer irreparable harm.**

"A plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001); *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) (holding that there is a showing of irreparable harm when the "harm cannot be compensated after the fact by monetary damages"); *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (holding that an injury is irreparable when it is of the sort that "cannot be adequately atoned for in money"). It is clear that in this case "[d]amages would be inadequate or difficult to ascertain," *Dominion Video Satellite, Inc.*, 269 F.3d at 1156, as Plaintiffs' injuries stem from their subjugation under the law and their disparate treatment by RTD on the basis of their disabilities. "Dignitary wounds cannot always be healed with the stroke of a pen." *Obergefell v. Hodges*, 576 U.S. 644, 678 (2015). For these reasons, courts have generally held that the violation of a plaintiff's

civil rights constitutes irreparable harm. *Free the Nipple-Fort Collins*, 916 F.3d at 806; *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012); *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001). Ultimately, the elimination of services that contribute to individuals with disabilities' "sense of emotional and psychological well-being" constitutes an irreparable "injury for which injunctive relief is appropriately granted." *Concerned Parents to Save Dreher Park Ctr.*, 846 F. Supp. at 992.

### 4.4 **The equities weigh in favor of an injunction.**

Courts generally hold that the equities weigh in favor of preventing the ongoing violation of a party's civil rights. 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.2 ("[W]hen plaintiff is claiming the loss of a constitutional right, courts commonly rule that even a temporary loss outweighs any harm to defendant and that a preliminary injunction should issue[.]"). That is why when a civil right hangs in the balance "even a temporary loss [of that right] usually trumps any harm to the defendant." *Free the Nipple-Fort Collins*, 916 F.3d at 806; *see also Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013).

Further, RTD would not suffer harm from an injunction because it has no cognizable interest in making amendments to its budget that violate civil rights laws. *Free the Nipple-Fort Collins*, 916 F.3d at 806 (holding that "the City has no interest in keeping an unconstitutional law on the books"); *Awad*, 670 F.3d at 1131 ("[W]hen the law that voters wish to enact is likely unconstitutional, their interests do not outweigh [a plaintiff's interest] in having his constitutional rights protected.").

Finally, a public entity's interests in "fiscal integrity and maintaining a balanced budget" do not outweigh the harm suffered by individuals with disabilities when their civil rights under the ADA are violated. *Concerned Parents to Save Dreher Park Ctr.*, 846 F. Supp. at 992-93. And,

because of that, "the expenditure of funds cannot be considered a harm if the law requires it." *Id*. (citing *Stone v. City and County of San Francisco,* 968 F.2d 850, 858 (9th Cir. 1992)).

### 4.5 **The public interest would be served by an injunction.**

"It is always in the public interest to prevent the violation of a party's" civil rights. *Awad*, 670 F.3d at 1131; *Free the Nipple-Fort Collins*, 916 F.3d at 807. The public has an interest in "upholding the principle of equal rights for individuals with disabilities." *Concerned Parents to Save Dreher Park Ctr. v. City of W. Palm Beach*, 846 F. Supp. 986, 993 (S.D. Fla. 1994) ("The equality of all persons is the underlying principle of the ADA, and one which the public has a strong interest in promoting."). This interest outweighs any "public interest in balancing [RTD]'s budget[.]" *Id.* The public interest weighs in favor of issuing an injunction here.

### 4.6 **This Court should not require bond.**

Under Federal Rules of Civil Procedure 65(c), district courts have discretion to determine the amount of the bond accompanying a preliminary injunction. This includes the authority to set a nominal bond. *See Denver Homeless Out Loud v. Denver*, 514 F. Supp. 3d 1278, 1307 (D. Colo. 2021), *rev'd on other grounds, Denver Homeless out Loud v. Denver*, 32 F.4th 1259 (10th Cir. 2022); *see also* 11A Charles Alan Wright et al., Federal Practice & Procedure § 2954 n.29 (3d ed., Apr. 2017 update) (citing public rights cases where the bond was excused or significantly reduced). This Court should waive bond because the requested interim relief is in the public interest, *Davis v. Mineta*, 302 F.3d 1104, 1126 (10th Cir. 2002), and the injunction is necessary to vindicate Plaintiffs' civil rights. *Complete Angler, L.L.C. v. City of Clearwater*, 607 F.Supp.2d 1326, 1335 (M.D. Fla. 2009).

## 5. **REQUESTED INJUNCTION**

Plaintiffs respectfully request that this Court enjoin RTD's planned changes to the Access-on-Demand program that disparately impact individuals with disabilities, including the:

- 450% increase to the cost per ride required to access the Access-on-Demand program (increasing the amount from $0 to $4.50);
- 20% reduction in subsidy per ride for rides provided by Access-on-Demand (reducing the subsidy amount from $25 to $20); and
- Reduction in service hours for Access-on-Demand (eliminating service between the hours of 1:30 a.m. and 3:30 a.m.).

Plaintiffs also respectfully request that this Court enter an injunction prohibiting RTD from imposing any other disparate cuts to or disparate imposition of costs to the Access-on-Demand program for the duration of this litigation.

6. **CONCLUSION**

For the above-stated reasons, Plaintiffs ask that this Court enjoin RTD's planned cuts to and imposition of costs for Access-on-Demand, which are (at present) set to go into effect on January 1, 2026.

Dated: December 7, 2025.

NEWMAN | MCNULTY

*s/ Andy McNulty*
Mari Newman
Andy McNulty
Madeline Leibin
1490 N. Lafayette Street Suite 304
Denver, CO 80218
(720) 850 - 5770
mari@newman-mcnulty.com
andy@newman-mcnulty.com
madeline@newman-mcnulty.com

ATTORNEYS FOR PLAINTIFFS

15

**CERTIFICATE OF SERVICE**

   I hereby certify that on December 7, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for all parties who have entered their appearances in this matter.

               NEWMAN | MCNULTY

               *s/ Andy McNulty*
               Andy McNulty